# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

FENNER DUNLOP AMERICAS, LLC,    :
Omega Corporate Center    :
1000 Omega Drive, Suite 1400    :
Pittsburgh, Pennsylvania 15205    :
    :
        Plaintiff,    :
    :
v.    :    Civil Action No.:
    :
INTERNATIONAL CONVEYOR &    :
RUBBER, LLC,    :    Judge
72 Industrial Park Road    :
Blairsville, Pennsylvania 15717    :
    :
Statutory Agent:    :
CT Corporation    :
116 Pine Street    :
Suite 320    :
Harrisburg, Pennsylvania 17101    :
    :
and    :
    :
RYAN J. CARINGOLA,    :
10 South Oak Street    :
Fairchance, Pennsylvania 15436    :
    :
and    :
    :
MICHAEL J. COLEMAN,    :
6438 Newport Road    :
Clarksburg, Pennsylvania 15725    :
    :
and    :
    :
JORDAN L. HALL,    :
102 Marianna Road    :
Clarksville, Pennsylvania 15332    :
    :
and    :

RICHARD A. KING, JR.                           :
310 4th Street                                 :
P.O. Box 136                                   :
Allison, Pennsylvania 15413                    :
                                               :
        Also Serve:                            :
        88 Greincki Street                     :
        P.O. Box 251                           :
        Republic, Pennsylvania 15475           :
                                               :
and                                            :
                                               :
JEFFREY A. ZEBLEY,                             :
542 Brownfield Alley                           :
Uniontown, Pennsylvania 15401                  :

        Defendants.

**COMPLAINT OF FENNER DUNLOP AMERICAS, LLC WITH JURY DEMAND**

Now comes Plaintiff Fenner Dunlop Americas, LLC ("Fenner"), by and through its counsel, and for its Complaint against Defendants International Conveyor & Rubber, LLC, Ryan J. Caringola, Michael J. Coleman, Jordan L. Hall, Richard A. King, Jr., and Jeffrey A. Zebley (collectively, "Defendants") alleges as follows:

## <u>INTRODUCTION</u>

1.      This action arises from a concerted plan of Defendant International Conveyor & Rubber, LLC ("ICR") to raid Fenner's business, misappropriate Fenner's trade secrets and move Fenner's customers and employees to ICR in direct competition against Fenner.

2.      Between September 23 and October 8, 2016, five Fenner employees – Defendants Ryan J. Caringola ("Caringola"), Michael J. Coleman ("Coleman"), Jordan L. Hall ("Hall"), Richard A. King, Jr. ("King"), and Jeffrey A. Zebley ("Zebley") (collectively, the "Individual Defendants") – unexpectedly and without warning, in coordination with each other and with

ICR, announced their resignations from Fenner and then went to work for Fenner's direct competitor, ICR.

3.      Since then, on ICR's behalf, the Individual Defendants have been competing against Fenner in violation of their employment agreements, utilizing Fenner's trade secrets and/or attempting to induce other Fenner employees to leave for ICR.

4.      The Individual Defendants' participation in ICR's raiding scheme and subsequent employment with ICR are direct violations of the restrictive covenants –specifically, the non-solicitation, non-competition, non-disclosure and/or non-interference provisions – in their employment agreements with Fenner and/or clear violations of federal and state law.

5.      Pursuant to their non-disclosure obligations, the Individual Defendants are prohibited from disclosing or utilizing any of Fenner's confidential and/or trade secret information.  Pursuant to their non-solicitation provisions, many of the Individual Defendants are prohibited from soliciting or inducing any Fenner or Fenner affiliate employees, vendors, or contractors to cease providing services to Fenner or its affiliates.   Pursuant to their non-competition provisions, upon leaving Fenner, many of the Individual Defendants are prohibited from working or consulting for any business or person that competes with Fenner's business of manufacturing, marketing, and servicing industrial conveyor belting.  Pursuant to their non-interference provisions, upon leaving Fenner, many of the Individual Defendants are prohibited from soliciting Fenner's customers, prospects, or business and from disrupting, damaging, impairing, disparaging, or interfering with Fenner's business, including its relationships with employees, customers, or vendors.

6.      These reasonable restrictive covenants have been carefully drafted to protect Fenner's legitimate business interests.   The subject covenants are directly tied to Fenner's

business relationships and prohibit former employees from: (i) directly or indirectly soliciting Fenner's customers or otherwise diverting Fenner's business; (ii) disclosing or utilizing Fenner's confidential information; (iii) inducing co-workers from leaving Fenner; and (iv) inducing any vendors or contractors to cease or reduce their business ties with Fenner. These restrictions ensure that the goodwill and confidential business information surrounding Fenner's customer relationships, along with the personal relations developed over years with an investment of substantial time and effort by Fenner, are not unfairly used against Fenner in the market.

7.      Fenner also required the Individual Defendants execute the restrictive covenants to protect the significant financial and educational investment Fenner made in training the Individual Defendants.

8.      ICR and the Individual Defendants have ignored these contractual obligations and used this protected and valuable information to directly compete against Fenner.

9.      ICR has illegally capitalized on the customer relationships Fenner entrusted to the Individual Defendants and the significant financial and educational investment Fenner made in the Individual Defendants.  This allows ICR to benefit from Fenner's long standing customer relationships and receive the revenue generated by employees Fenner trained without incurring the expense of training the Individual Defendants.

10.      ICR has also intentionally misappropriated Fenner's confidential and trade secret information and tortiously interfered with Fenner's contractual and business relations in a premediated scheme to use that information in direct competition against Fenner.

11.      Fenner's loss of business as a direct result of ICR's actions has been real, concrete, and measurable.  Indeed, shortly after the Individual Defendants' departure, Fenner

began to receive notifications from long-term customers stating that they were transitioning business from Fenner to ICR.

12.     Fenner also believes that Defendants are or intend to actively recruit additional Fenner employees and/or customers to leave.

13.     Fenner has been and will continue to be irreparably injured by the breaches and tortious acts of unfair competition committed by Defendants.  Fenner will continue to suffer irreparable and monetary harm in the form of loss of business, loss of goodwill, fractured business relationships, loss of future business opportunities, loss of employees, and misappropriation and disclosure of confidential and/or trade secret information.

## PARTIES

14.     Fenner is a Delaware limited liability company that is licensed to do business in Pennsylvania and is headquartered at 1000 Omega Drive, Suite 1400, Pittsburgh, Allegheny County, Pennsylvania within this judicial district.

15.     Defendant ICR is a Pennsylvania limited liability company having its principal place of business at 72 Industrial Park Road, Blairsville, Indiana County, Pennsylvania.  ICR was formed by former managers of Fenner for the specific purpose of competing against Fenner.

16.     Defendant Caringola is an individual who currently resides at 10 South Oak Street, Fairchance, Fayette County, Pennsylvania within this judicial district.

17.     Defendant Michael J. Coleman is an individual who currently resides at 6438 Newport Road Clarksburg, Indiana County, Pennsylvania within this judicial district.

18.     Defendant Jordan L. Hall is an individual who currently resides at 102 Marianna Road, Clarksville, Greene County, Pennsylvania within this judicial district.

19.     Upon information and belief, Defendant Richard A. King, Jr. is an individual who currently resides at 310 4th Street, Allison, Fayette County, Pennsylvania within this judicial district.  Upon information and belief, Defendant Richard A. King, Jr. may reside at 88 Greincki Street, Republic, Fayette County, Pennsylvania within this judicial district.

20.     Defendant Jeffrey A. Zebley is an individual who currently resides at 542 Brownfield Alley, Uniontown, Fayette County, Pennsylvania within this judicial district.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action by virtue of 18 U.S.C. § 1836(b), because Fenner brings a claim of Defendants' violation of federal law pursuant to the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836(b).  This Court has supplemental jurisdiction over Fenner's state law claims pursuant to 28 U.S.C. § 1367.

22.     This Court has personal jurisdiction over the Individual Defendants pursuant to 42 Pa.C.S. § 5301(a)(1) because they are domiciled in the Commonwealth of Pennsylvania. Alternatively, this Court has personal jurisdiction over the Individual Defendants pursuant to 42 Pa.C.S. § 5322 because they transacted business and caused tortious injury in the Commonwealth of Pennsylvania and within this judicial district.

23.     This Court also has personal jurisdiction over ICR because it is a Pennsylvania limited liability company that has transacted business and caused tortious injury in the state of Pennsylvania and within this judicial district.

24.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(1) because Defendants are residents of Pennsylvania and reside within this judicial district.  Venue is also appropriate in this judicial district under 28 U.S.C. § 1391(b)(2) because the events that gave rise to this complaint occurred in this district.

## FACTUAL BACKGROUND

### A.   Fenner

25.     Fenner is the market leader in the production of full range conveyor belting, conveyor components, and related services, which includes, but is not limited to, conveyor belt installation, splicing, repair, and maintenance.   Fenner's belting is used extensively in underground coal mining and a wide variety of industrial markets.

26.     Fenner has invested significant time and resources into training its employees to ensure that they maintain the highest possible certifications, techniques and professional standards.   This includes the Individual Defendants, who each received significant training and certifications that Fenner provided and paid for.

27.     Fenner's full service business model allows it to meet its customers' conveyor belting needs, which sets it apart from the competition and leads to the development of close, personal relationships between Fenner's employees and its customers.   Consequently, Fenner employees who engage in servicing the conveyor belting needs of mining operations become the "face" of Fenner to its various customers.

28.     Fenner's most important assets are its customers, employees, and specific trade secret information it has developed over the years.   Fenner, thus, uses reasonable means to protect the customer and employee relationships it has created, developed, and maintained.   To that end, certain employees, in consideration for their employment and/or training, execute written agreements whereby they agree not to, among other things: (i) solicit or divert business from Fenner for six months to one year following their departure from Fenner; (ii) compete with Fenner by working for or advising a business or person in competition with Fenner; (iii) induce or influence other employees, contractors, or vendors to cease their business relationships with

Fenner; and (iv) disrupt or otherwise interfere with Fenner's business, including its business relationships.

29.     Fenner has developed confidential and proprietary information relating to its mining and conveyor belting products and services it provides to its customers.  This information includes, but is not limited to, customer lists, detailed customer profiles, buying patterns, customer needs and preferences, customer-specific pricing, techniques, and services, manufacturing, maintenance and /or installation techniques.

30.     Fenner uses reasonable means to protect the confidentiality of its proprietary information.  Fenner employees who have access to Fenner's confidential and proprietary information sign agreements with Fenner in which they agree that they will not disclose Fenner's confidential and proprietary information, nor make use of it for their own purposes or for a competitor's purposes during and after their employment with Fenner.  The disclosure of this confidential and proprietary information outside of Fenner will cause Fenner to lose the valuable competitive advantage it has developed as a result of this information.

### B.     ICR

31.     ICR is a conveyor belt sales and repair company, headquartered in Blairsville, Pennsylvania that was recently formed by former Fenner managers.

32.     ICR is a direct competitor of Fenner and was formed to take business from Fenner.

33.     Because ICR was formed and managed by former Fenner managers, ICR knew or should have known that Fenner employees, including all of the Individual Defendants, had employment agreements and/or non-disclosure agreements with Fenner that prohibited them

from competing against Fenner, soliciting Fenner's employees and/or disclosing Fenner's trade secret information.

34.     Despite its knowledge of the Individual Defendants' restrictive covenants with Fenner, ICR actively and maliciously recruited Fenner's employees, including the Individual Defendants, to aggressively compete against Fenner, misappropriate Fenner's trade secrets, and utilize the certifications and training that Fenner provided to and for which Fenner paid to benefit the Individual Defendants.

35.     After the Individual Defendants' departure from Fenner, several long-standing customers have terminated and/or indicated their intent to terminate and/or transition their business relationship with Fenner in favor of ICR.  Consequently, Fenner has lost significant revenue as a result of the actions of ICR and the Individual Defendants.

### C.     Michael Coleman

36.     Defendant Coleman joined Fenner in or about 2010 and worked in various mining positions, all of which required extensive training and certifications.  Prior to his resignation, Coleman worked as a Foreman Technician at Fenner.

37.     While employed by Fenner, Coleman occupied a position of trust and confidence in which he had significant client interaction and was entrusted with and had access to Fenner's confidential and proprietary information, including but not limited to customer lists, detailed customer profiles, buying patterns, customer needs and preferences, and customer-specific pricing and services.

38.     Fenner also invested significant time, money and resources into training Coleman.

39.     On or about July 15, 2014, Coleman entered into a Retention Agreement with Fenner Dunlop Conveyor Systems and Services, Inc. ("Coleman Agreement").   A true and accurate copy of the Coleman Agreement is attached as Exhibit A.

40.     On or about October 8, 2016, Coleman unexpectedly announced his resignation from Fenner.   Shortly thereafter, Coleman went to work at ICR in direct competition against Fenner.

41.     Coleman's employment at ICR constitutes a breach of the terms of the Coleman Agreement.

42.     As set forth in Exhibit A, Coleman agreed not to directly or indirectly solicit or induce any Fenner employees, vendors, or contractors to cease providing services to Fenner during his employment with Fenner and for a period of one year following the termination or expiration of his employment with Fenner.

43.     Specifically, during his employment with Fenner and for a period of one year after his employment ended, Coleman agreed that he would not:

> directly or indirectly, seek to, assist another to or in fact hire as an employee or engage as a consultant any employee, vendor, or contractor of Employer or its Affiliated Entities, or otherwise solicit or induce or attempt to solicit or induce any employee, vendor, or contractor of Employer or its Affiliated Entities to cease such employee, vendor, or contractor's provision of services to Employer of its Affiliated Entities.

(Exhibit A at ¶ 7(b)).

44.     Coleman further agreed not to compete with Fenner by working for or advising a business or person in competition with Fenner during his employment with Fenner and for a period of one year after his employment ended.  Specifically, Coleman agreed that he would not:

> directly or indirectly (A) engage or invest in, (B) own manage, operate, finance, control, (C) consult with, (D) participate in the

> ownership, management, operation, financing or control of, (E) consult for, (F) be employed by, of (G) lend [his] name to, or render services or advice to, any business or person that competes with the Employer or its Affiliated Entities anywhere in the world.

(Exhibit A at ¶ 7(c)(i)).

45.     Further still, as set forth in Exhibit A, Coleman agreed not to solicit Fenner's customers, prospects, or business and to not damage or interfere with Fenner's business, including its relationships with employees, customers, or vendors during his employment with Fenner and for a period of one year after his employment ended.  Specifically, Coleman agreed that he would not:

> (ii)     solicit, divert, entice, or otherwise take away any customers, active prospects, business, patronage, or orders of the Employer or its Affiliated Entities or attempt to do so; or

> (iii)    disrupt, damage, impair, disparage or interfere with the Employer's business or that of its Affiliated Entities, whether by way of interfering with or disrupting Employer's or any Affiliated Entity's relationship with employees, customers, agents, contractors, representatives, or vendors.

(Exhibit A at ¶¶ 7(c)(ii)-(iii)).

46.     Coleman acknowledged and agreed that he would have access to confidential and proprietary information of Fenner.

47.     Coleman agreed that he would not use or disclose the confidential and proprietary information of Fenner.  Specifically, Coleman agreed that without Fenner's prior approval, he would not "directly or indirectly disclose any Proprietary Information to any person except authorized personnel of an Affiliated Entity; or use Proprietary Information in any manner other than in furtherance of the business of the Affiliated Entities."  (Exhibit A at ¶ 6(b)).

48.     "Proprietary Information" is defined in Exhibit A as:

any trade secret, confidential study, data, calculations, software storage media or other compilation of information, patent, patent application, copyright, trademark, trade name, service mark, service name, "know-how," trade secrets, customer lists, details of client or consultant contracts, pricing policies, sales techniques, confidential information relating to suppliers, information relating to the special and particular needs of the customers of Employer or any Affiliated Entity, operational methods, marketing plans or strategies, products and formulae, product development techniques or plans, business acquisition plans or any portion or phase of any scientific or technical information, ideas, discoveries, designs, computer programs (including source and object codes), websites, processes, procedures, research or technical data, improvements or other proprietary or intellectual property of Employer or any Affiliated Entity, whether or not in written or tangible form, and whether or not registered, and including all files, records, manuals, books, catalogues, memoranda, notes, summaries, plans, reports, records, documents and other evidence thereof.

(Exhibit A at ¶ 6(a)).

49.     At no time did Fenner relieve Coleman of his obligations set forth in Exhibit A.

50.     Coleman acknowledged and agreed that any breaches of these restrictions may cause irreparable harm to Fenner.

51.     Coleman also agreed that if he violated the Coleman Agreement, Fenner "[would] be entitled to an accounting, and to the repayment of all profits, compensation, commissions, fees, royalties, or other financial rewards that [he] or any other entity or Person may realize as a result of [his violation]." (Exhibit A at ¶ 9).

52.     Further still, in the event he violated the Coleman Agreement, Coleman "agree[d] to pay [Fenner's] costs and attorneys' fees incurred in pursuing its rights with respect to this Agreement." (Exhibit A at ¶ 9).

53.     Since leaving Fenner, Coleman has violated the terms of the Coleman Agreement by accepting employment at ICR in direct competition against Fenner and engaging in efforts to move business from Fenner.

54.     It is also believed that Coleman has used and/or disclosed Fenner's confidential, trade secret and/or proprietary information since the termination of his employment from Fenner to compete against Fenner and take business away from Fenner.

**D.     Jordan Hall**

55.     Defendant Hall worked in various mining positions at Fenner, all of which required extensive training and certifications that Fenner provided and for which Fenner paid.

56.     Prior to his resignation, Hall worked as a Service Technician at Fenner.

57.     While employed by Fenner, Hall occupied a position of trust and confidence in which he had significant client interactions and was entrusted with and had access to Fenner's confidential, trade secret and/or proprietary information.

58.     On or about May 6, 2015, Hall entered into an Employee Agreement with Fenner ("Hall Agreement").  A true and accurate copy of the Hall Agreement is attached as Exhibit B and is incorporated herein by reference.

59.     On or about September 23, 2016, Hall unexpectedly announced his resignation from Fenner.  Shortly thereafter, Hall went to work at ICR in direct competition against Fenner.

60.     Hall agreed not to directly or indirectly solicit or induce any Fenner employees, vendors, or contractors to cease providing services to Fenner during his employment with Fenner and for a period of six months following the termination or expiration of his employment with Fenner.

61.     Specifically, during his employment with Fenner and for a period of six months after his employment ended, Hall agreed that he would not:

> directly or indirectly, seek to, assist another to or in fact hire as an
> employee or engage as a consultant any employee, vendor, or
> contractor of Employer or its Affiliates, or otherwise solicit or
> induce or attempt to solicit or induce any employee, vendor, or

> contractor of Employer or its Affiliates to cease such employee,
> vendor, or contractor's provision of services to Employer or its
> Affiliates.

(Exhibit B at ¶ 8(b)).

62.     Hall further agreed not to compete with Fenner by working for or advising a business or person in competition with Fenner during his employment with Fenner and for a period of six months after his employment ended.  Specifically, Hall agreed that he would not:

> directly or indirectly (A) engage or invest in, (B) own, manage,
> operate, finance, control, (C) consult with, (D) participate in the
> ownership, management, operation, financing or control of, (E)
> consult for, (F) be employed by, or (G) lend [his] name to, or
> render services or advice to, any business or Person that competes
> with the Business anywhere in the world.

(Exhibit B at ¶ 8(c)(i)).

63.     Hall also agreed not to solicit Fenner's customers, prospects, or business and to not damage or interfere with Fenner's business, including its relationships with employees, customers, or vendors during his employment with Fenner and for a period of six months after his employment ended.  Specifically, Hall agreed that he would not:

> (ii)    solicit, divert, entice, or otherwise take away any
>         customers, active prospects, business, patronage, or orders
>         of the Business or attempt to do so; or
>
> (iii)   disrupt, damage, impair, disparage or interfere with the
>         Business, whether by way of interfering with or disrupting
>         Employer's relationship with employees, customers,
>         agents, contractors, representatives or vendors.

(Exhibit B at ¶¶ 8(c)(ii)-(iii)).

64.     Hall further acknowledged and agreed that he would have access to confidential and proprietary information of Fenner.

65.     Hall also agreed that he would not use or disclose the confidential and proprietary information of Fenner.  Specifically, Hall agreed that:

> during and after [his] employment, [he would] keep secret and confidential all Proprietary Information and will not, directly or indirectly, in one or a series of transactions, disclose to any Person, or use or otherwise exploit for [his] own benefit or for the benefit of any Person other than Employer or its Affiliates, Proprietary Information, whether or not prepared by [him].

(Exhibit B at ¶ 5(a)).

66.     "Proprietary Information" is defined in Exhibit B as:

> any confidential information, including, without limitation, any trade secret, confidential study, data, calculations, software storage media or other compilation of information, patent, patent application, copyright, trademark, trade name, service mark, service name, "know-how," trade secrets, customer lists, details of client or consultant contracts, pricing policies, sales techniques, confidential information relating to suppliers, information relating to the special and particular needs of the customers of Employer or its Affiliates, operational methods, marketing plans or strategies, products and formulae, product development techniques or plans, business acquisition plans or any portion or phase of any scientific or technical information, ideas, discoveries, designs, computer programs (including source and object codes), websites, processes, procedures, research or technical data, improvements or other proprietary or intellectual property of Employer or its Affiliates, whether or not in written or tangible form, and whether or not registered, and including all files, records, manuals, books, catalogues, memoranda, notes, summaries, plans, reports, records, documents and other evidence thereof.

(Exhibit B at ¶ 1(g)).

67.     At no time did Fenner relieve Hall of his obligations set forth in Exhibit B.

68.     Hall acknowledged and agreed that any breaches of the Hall Agreement may cause immediate and irreparable harm to Fenner.

69.     Hall also agreed that if he violated the Hall Agreement, Fenner "[would] be entitled to an accounting, and to the repayment of all profits, compensation, commissions, fees,

royalties, or other financial rewards that [he] or any other entity or Person may realize as a result of [his violation]."  (Exhibit B at ¶ 11).

70.     Further still, in the event he violated the Hall Agreement, Hall "agree[d] to pay [Fenner's] costs and attorneys' fees incurred in pursuing its rights with respect to this Agreement."  (Exhibit B at ¶ 11).

71.     Since leaving Fenner, Hall has violated the Hall Agreement by accepting employment at ICR in direct competition against Fenner and engaging in efforts to move business from Fenner.

72.     It is further believed that Hall has used and/or disclosed Fenner's confidential, trade secret and/or proprietary information since the termination of his employment from Fenner to compete against Fenner and take business away from Fenner.

        **E.**      **Richard King**

73.     Defendant King worked in various mining positions, all of which required extensive training and certifications.  Prior to his resignation, King worked as a Technician I.

74.     While employed by Fenner, King occupied a position of trust and confidence in which he had constant interaction with Fenner's customers and had access to and was entrusted with Fenner's confidential and proprietary information, including but not limited to customer lists, detailed customer profiles, buying patterns, customer needs and preferences, and customer-specific pricing and services.

75.     On or about March 24, 2015, King entered into an Employee Agreement with Fenner ("King Agreement").  A true and accurate copy of the King Agreement is attached as Exhibit C and is incorporated herein by reference.

76.     On or about September 27, 2016, King unexpectedly announced his resignation from Fenner.  Shortly thereafter, King went to work at ICR in direct competition against Fenner.

77.     As set forth in Exhibit C, King agreed not to directly or indirectly solicit or induce any Fenner employees, vendors, or contractors to cease providing services to Fenner during his employment with Fenner and for a period of six months following the termination or expiration of his employment with Fenner.

78.     Specifically, during his employment with Fenner and for a period of six months after his employment ended, King agreed that he would not:

> directly or indirectly, seek to, assist another to or in fact hire as an employee or engage as a consultant any employee, vendor, or contractor of Employer or its Affiliates, or otherwise solicit or induce or attempt to solicit or induce any employee, vendor, or contractor of Employer or its Affiliates to cease such employee, vendor, or contractor's provision of services to Employer or its Affiliates.

(Exhibit C at ¶ 8(b)).

79.     King further agreed not to compete with Fenner by working for or advising a business or person in competition with Fenner during his employment with Fenner and for a period of six months after his employment ended.  Specifically, King agreed that he would not:

> directly or indirectly (A) engage or invest in, (B) own, manage, operate, finance, control, (C) consult with, (D) participate in the ownership, management, operation, financing or control of, (E) consult for, (F) be employed by, or (G) lend [his] name to, or render services or advice to, any business or Person that competes with the Business anywhere in the world.

(Exhibit C at ¶ 8(c)(i)).

80.     King agreed not to solicit Fenner's customers, prospects, or business and to not damage or interfere with Fenner's business, including its relationships with employees,

customers, or vendors during his employment with Fenner and for a period of six months after his employment ended.  Specifically, King agreed that he would not:

> (ii)   solicit, divert, entice, or otherwise take away any customers, active prospects, business, patronage, or orders of the Business or attempt to do so; or
>
> (iii)  disrupt, damage, impair, disparage or interfere with the Business, whether by way of interfering with or disrupting Employer's relationship with employees, customers, agents, contractors, representatives or vendors.

Exhibit C at ¶¶ 8(c)(ii)-(iii).

81.     As set forth in Exhibit C, King acknowledged and agreed that he would have access to confidential and proprietary information of Fenner.

82.     As set forth in Exhibit C, King agreed that he would not use or disclose the confidential and proprietary information of Fenner.  Specifically, King agreed that:

> during and after [his] employment, [he] will keep secret and confidential all Proprietary Information and will not, directly or indirectly, in one or a series of transactions, disclose to any Person, or use or otherwise exploit for [his] own benefit or for the benefit of any Person other than Employer or its Affiliates, Proprietary Information, whether or not prepared by [him].

Exhibit C at ¶ 5(a).

83.     "Proprietary Information" is defined in Exhibit C as:

> any confidential information, including, without limitation, any trade secret, confidential study, data, calculations, software storage media or other compilation of information, patent, patent application, copyright, trademark, trade name, service mark, service name, "know-how," trade secrets, customer lists, details of client or consultant contracts, pricing policies, sales techniques, confidential information relating to suppliers, information relating to the special and particular needs of the customers of Employer or its Affiliates, operational methods, marketing plans or strategies, products and formulae, product development techniques or plans, business acquisition plans or any portion or phase of any scientific or technical information, ideas, discoveries, designs, computer

> programs (including source and object codes), websites, processes, procedures, research or technical data, improvements or other proprietary or intellectual property of Employer or its Affiliates, whether or not in written or tangible form, and whether or not registered, and including all files, records, manuals, books, catalogues, memoranda, notes, summaries, plans, reports, records, documents and other evidence thereof.

(Exhibit C at ¶ 1(g)).

84.     At no time did Fenner relieve King of his obligations set forth in Exhibit C.

85.     King acknowledged and agreed that any breaches of the King Agreement may cause immediate and irreparable harm to Fenner.

86.     King also agreed that if he violated the King Agreement, Fenner "[would] be entitled to an accounting, and to the repayment of all profits, compensation, commissions, fees, royalties, or other financial rewards that [he] or any other entity or Person may realize as a result of [his violation]."  (Exhibit C at ¶ 11).

87.     Further still, in the event he violated the King Agreement, King "agree[d] to pay [Fenner's] costs and attorneys' fees incurred in pursuing its rights with respect to this Agreement."  (Exhibit C at ¶ 11).

88.     Since leaving Fenner, King has violated the King Agreement by accepting employment at ICR in direct competition against Fenner and engaging in efforts to move business from Fenner.

89.     It is further believed that King has used and/or disclosed Fenner's confidential, trade secret and/or proprietary information since the termination of his employment from Fenner to compete against Fenner and take business away from Fenner.

F.      **Jeffrey Zebley**

90.     Defendant Zebley worked in various mining positions at Fenner, all of which required extensive training and certifications that Fenner provided and for which Fenner paid. Prior to his resignation, Zebley worked as a Technician I.

91.     While employed by Fenner, Zebley occupied a position of trust and confidence in which he had constant interaction with Fenner's customers and was entrusted with and had access to Fenner's confidential and proprietary information, including but not limited to customer lists, detailed customer profiles, buying patterns, customer needs and preferences, and customer-specific pricing and services.

92.     On or about March 24, 2015, Zebley entered into an Employee Agreement with Fenner ("Zebley Agreement").  A true and accurate copy of the Zebley Agreement is attached as Exhibit D and is incorporated herein by reference.

93.     On or about October 1, 2016, Zebley unexpectedly announced his resignation from Fenner.  Shortly thereafter, Zebley went to work at ICR in direct competition against Fenner.

94.     Zebley agreed not to directly or indirectly solicit or induce any Fenner employees, vendors, or contractors to cease providing services to Fenner during his employment with Fenner and for a period of six months following the termination or expiration of his employment with Fenner.

95.     Specifically, during his employment with Fenner and for a period of six months after his employment ended, Zebley agreed that he would not:

> directly or indirectly, seek to, assist another to or in fact hire as an employee or engage as a consultant any employee, vendor, or contractor of Employer or its Affiliates, or otherwise solicit or induce or attempt to solicit or induce any employee, vendor, or

> contractor of Employer or its Affiliates to cease such employee,
> vendor, or contractor's provision of services to Employer or its
> Affiliates.

(Exhibit D at ¶ 8(b)).

96.     Zebley further agreed not to compete with Fenner by working for or advising a business or person in competition with Fenner during his employment with Fenner and for a period of six months after his employment ended.  Specifically, Zebley agreed that he would not:

> directly or indirectly (A) engage or invest in, (B) own, manage,
> operate, finance, control, (C) consult with, (D) participate in the
> ownership, management, operation, financing or control of, (E)
> consult for, (F) be employed by, or (G) lend [his] name to, or
> render services or advice to, any business or Person that competes
> with the Business anywhere in the world.

(Exhibit D at ¶ 8(c)(i)).

97.     Zebley also agreed not to solicit Fenner's customers, prospects, or business and to not damage or interfere with Fenner's business, including its relationships with employees, customers, or vendors during his employment with Fenner and for a period of six months after his employment ended.  Specifically, Zebley agreed that he would not:

> (ii)    solicit, divert, entice, or otherwise take away any
>         customers, active prospects, business, patronage, or orders
>         of the Business or attempt to do so; or
>
> (iii)   disrupt, damage, impair, disparage or interfere with the
>         Business, whether by way of interfering with or disrupting
>         Employer's relationship with employees, customers,
>         agents, contractors, representatives or vendors.

(Exhibit D at ¶¶ 8(c)(ii)-(iii)).

98.     Zebley acknowledged and agreed that he would have access to confidential and proprietary information of Fenner.

99.     Zebley also agreed that he would not use or disclose the confidential and

proprietary information of Fenner.  Specifically, Zebley agreed that:

> during and after [his] employment, [he] will keep secret and
> confidential all Proprietary Information and will not, directly or
> indirectly, in one or a series of transactions, disclose to any Person,
> or use or otherwise exploit for [his] own benefit or for the benefit
> of any Person other than Employer or its Affiliates, Proprietary
> Information, whether or not prepared by [him].

(Exhibit D at ¶ 5(a)).

100.    "Proprietary Information" is defined in Exhibit D as:

> any confidential information, including, without limitation, any
> trade secret, confidential study, data, calculations, software storage
> media or other compilation of information, patent, patent
> application, copyright, trademark, trade name, service mark,
> service name, "know-how," trade secrets, customer lists, details of
> client or consultant contracts, pricing policies, sales techniques,
> confidential information relating to suppliers, information relating
> to the special and particular needs of the customers of Employer or
> its Affiliates, operational methods, marketing plans or strategies,
> products and formulae, product development techniques or plans,
> business acquisition plans or any portion or phase of any scientific
> or technical information, ideas, discoveries, designs, computer
> programs (including source and object codes), websites, processes,
> procedures, research or technical data, improvements or other
> proprietary or intellectual property of Employer or its Affiliates,
> whether or not in written or tangible form, and whether or not
> registered, and including all files, records, manuals, books,
> catalogues, memoranda, notes, summaries, plans, reports, records,
> documents and other evidence thereof.

(Exhibit D at ¶ 1(g)).

101.    At no time did Fenner relieve Zebley of his obligations set forth in Exhibit D.

102.    Zebley acknowledged and agreed that any breaches of the Zebley Agreement may

cause immediate and irreparable harm to Fenner.

103.    Zebley also agreed that if he violated the Zebley Agreement, Fenner "[would] be

entitled to an accounting, and to the repayment of all profits, compensation, commissions, fees,

royalties, or other financial rewards that [he] or any other entity or Person may realize as a result of [his violation]."  (Exhibit D at ¶ 11).

104.    Further still, in the event he violated the Zebley Agreement, Zebley "agree[d] to pay [Fenner's] costs and attorneys' fees incurred in pursuing its rights with respect to this Agreement."  (Exhibit D at ¶ 11).

105.    Since leaving Fenner, Zebley has violated the Zebley Agreement by accepting employment at ICR in direct competition against Fenner and engaging in efforts to move business from Fenner.

106.    It is further believed that Zebley has used and/or disclosed Fenner's confidential, trade secret and/or proprietary information since the termination of his employment from Fenner to compete against Fenner and take business away from Fenner.

### G.    Ryan Caringola

107.    Defendant Caringola joined Fenner worked in various mining positions at Fenner, all of which required extensive training and certifications.  Prior to his resignation, Caringola worked as a Technician I.

108.    While employed by Fenner, Caringola occupied a position of trust and confidence in which he had significant interaction with Fenner's customers and was entrusted with and had access to Fenner's confidential and proprietary information, including but not limited to customer lists, detailed customer profiles, buying patterns, customer needs and preferences, and customer-specific pricing and services.

109.    On or about August 9, 2013, Caringola entered into a Nondisclosure Agreement with Fenner ("Caringola Agreement").  A true and accurate copy of the Caringola Agreement is attached as Exhibit E and is incorporated herein by reference.

110.    On or about October 5, 2016, Caringola unexpectedly announced his resignation from Fenner.  Shortly thereafter, Caringola went to work at ICR in direct competition against Fenner.

111.    Caringola acknowledged and agreed that he would have access to confidential and proprietary information of Fenner.

112.    Caringola agreed that he would not use or disclose the confidential and proprietary information of Fenner for a period of three years from the date of the last disclosure of confidential information pursuant to the Caringola Agreement.  Specifically, Caringola agreed that:

> [he] will not use any Confidential Information for any purpose other than to further potential business transactions and related discussions between the parties.  [He] will not disclose or permit disclosure of any Confidential Information of the other party to third parties or to employees, other than directors, officers, employees, consultants, attorneys, accountants, and agents of [his] who require that information in order to further potential business transactions between the parties, or to comply with applicable law, and who are bound by nondisclosure obligations sufficient to enable [him] to comply with its obligations under this Agreement. [He] will be liable for misuse and/or improper disclosure of the Company's Confidential Information by its directors, officers, employees, consultants, attorneys, accountants, and agents. [He] will maintain all Confidential Information of the Company with at least the same degree of care it uses to protect its own proprietary information of similar nature, and in no case with less than reasonable care. [He] agrees to notify the Company in writing of any actual or suspected misuse, misappropriation or unauthorized disclosure of the Company's Confidential Information, which may come to [his] attention.

(Exhibit E at ¶ 2).

113.    Exhibit E defines "Confidential Information" as:

> any nonpublic information of the Company, in oral, written, graphic or machine-readable form, including without limitation that which relates to employment, executive management staffing,

> patents, patent applications, research, product plans, products, inventions, processes, designs, algorithms, source code, programs, business plans, agreements with third parties, services, customers, marketing or finances, which is designated as confidential or proprietary by the disclosing party at the time of disclosure, or which considering all the circumstances surrounding the disclosure, ought reasonably to be understood by [Caringola] to be confidential.

(Exhibit E at ¶ 1).

114.   At no time did Fenner relieve Caringola of his obligations set forth in Exhibit E.

115.   Caringola acknowledged and agreed that his obligations under Exhibit E were necessary and reasonable to protect Fenner and its business and further agreed that any breaches of Exhibit E would cause immediate and irreparable harm to Fenner.

116.   It is believed that Caringola has used and/or disclosed Fenner's confidential, trade secret and/or proprietary information since the termination of his employment from Fenner to compete against Fenner and take business away from Fenner.

## COUNT I

### (Tortious Interference With Contractual Relations Against ICR)

117.   Fenner realleges and incorporates paragraphs 1 through 116 above as if set forth herein.

118.   ICR was formed by former Fenner managers that had in depth knowledge of Fenner's employees, customers, and business operation.

119.   ICR knew or should have known of the existence of Fenner's rights under the agreements attached as Exhibits A through E and of the non-solicitation, non-competition, non-interference, and confidentiality covenants contained therein.

120.   Despite such knowledge, ICR intentionally, maliciously and improperly interfered with these contracts by permitting, causing, encouraging, and/or inducing the Individual

Defendants to breach the covenants contained in the agreements attached as Exhibits A through E.

121.    There was no privilege or justification for ICR's conduct.

122.    ICR intentionally, maliciously, and improperly interfered with Fenner's agreements, and acted with a conscious and/or reckless disregard of Fenner's rights.

123.    As a direct and proximate result of ICR's tortious interference with Fenner's contracts, Fenner has suffered economic losses and injury, loss of goodwill, and loss of future business opportunities as well as irreparable harm in the form of a loss of customers, loss of customer goodwill, and loss of future business opportunities.

124.    Because ICR acted intentionally, maliciously, or in reckless disregard of Fenner's rights an award of punitive damages is justified.

## COUNT II

**(Tortious Interference With Prospective Business Relations Against ICR)**

125.    Fenner realleges and incorporates paragraphs 1 through 124 above as if set forth herein.

126.    Fenner has a valid business expectancy that it would continue to provide conveyor belting products and services for certain of its customers, including the long-standing customers with which the Individual Defendants worked and that have terminated and/or indicated their intent to terminate and/or transition their business relationships with Fenner in favor of ICR following the Individual Defendants' departure from Fenner.

127.    ICR knew or should have known that Fenner has a valid business expectancy that it would continue to provide conveyor belting products and services for certain of its customers, including the long-standing customers with which the Individual Defendants worked and that

have terminated and/or indicated their intent to terminate and/or transition their business with Fenner in favor of ICR following the Individual Defendants' departure from Fenner, and acted with a conscious disregard of Fenner's rights.

128.    Despite such knowledge, ICR intentionally and improperly interfered with and prevented the prospective business relationships from occurring by poaching the Individual Defendants and poaching Fenner's long standing customers who have since terminated and/or indicated their intent to terminate and/or transitions their business relationships with Fenner in favor of ICR.

129.    ICR intentionally, maliciously, and improperly interfered with Fenner's business relationships, and acted with a conscious disregard of Fenner's rights.

130.    There was no privilege or justification for ICR's conduct.

131.    As a direct and proximate result of ICR's tortious interference with Fenner's business relations, Fenner has suffered economic losses and injury, loss of goodwill, and loss of future business opportunities.

132.    Fenner has suffered, and will continue to suffer, irreparable harm in the form of a loss of customers, loss of customer goodwill, and loss of future business opportunities as a result of this tortious conduct.

## COUNT III

### (Defend Trade Secrets Act (18 U.S.C. § 1836) Against All Defendants)

133.    Fenner realleges and incorporates paragraphs 1 through 132 above as if set forth herein.

134.   Aspects of Fenner's confidential and proprietary customer lists, detailed customer profiles, buying patterns, customer needs and preferences, and customer-specific pricing, techniques, and services ("Trade Secrets") constitute protectable trade secrets.

135.   The Trade Secrets relate to services used in or intended for use in interstate commerce.

136.   The Trade Secrets are extremely valuable to Fenner, are a critical part of its business, and are not readily ascertainable through proper means.

137.   Fenner has invested considerable time, effort, and money into compiling the Trade Secrets for its business.

138.   Fenner has derived actual economic value from the Trade Secrets that has put Fenner ahead of its competitors in providing customers with a full service business model in the mining industry, and expects to continue to derive further value as Fenner continues to improve its model.

139.   Fenner took reasonable steps to protect these trade secrets, including, among other things, instituting confidentiality policies, having employees agree to non-competition agreements and confidentiality and proprietary information agreements, sharing these trade secrets with a limited, restricted group, and labeling certain documents as proprietary and confidential.

140.   Fenner provided the Trade Secrets to the Individual Defendants pursuant to the agreements attached hereto as Exhibits A through E, which permitted the Individual Defendants to use the Trade Secrets solely for Fenner's business operations.

141.   The Individual Defendants knew they were subject to a duty to maintain the secrecy of and limit the use of the Trade Secrets.

142.     Upon information and belief, the Individual Defendants have retained the Trade Secrets and shared them with ICR, which has allowed them and will continue to allow them to copy Fenner's protectable trade secrets and benefit from the significant expense Fenner has incurred compiling this data and these strategies.

143.     Fenner has been harmed and will continue to be irreparably injured by Defendants' violation of this statute.

## COUNT IV

### (Misappropriation of Trade Secrets, 12 Pa.C.S. § 5302, *et seq*., Against All Defendants)

144.     Fenner realleges and incorporates paragraphs 1 through 143 above as if set forth herein.

145.     The Trade Secrets compiled by Fenner, including but not limited to, customer lists, detailed customer profiles, buying patterns, customer needs and preferences, and customer-specific pricing and services, are protectable as trade secrets under 12 Pa.C.S. § 5302.

146.     The Trade Secrets are valuable to Fenner and a critical part of its business and Fenner has invested considerable time, effort, and money into compiling the Trade Secrets for its business.

147.     Fenner has derived actual economic value from the Trade Secrets that has put Fenner ahead of its competitors in providing customers with a full service business model in the conveyor belting manufacturing and service industry, and expects to continue to derive further value as Fenner continues to improve its model.

148.     The Trade Secrets are not published to Fenner's competitors and Fenner took reasonable steps to protect the Trade Secrets, including but not limited to, instituting confidentiality policies and having valuable employees agree to non-competition agreements and

confidentiality and proprietary information agreements, sharing the Trade Secrets with a limited, restricted group, and labeling certain documents as proprietary and confidential.

149.    Fenner provided the Trade Secrets to the Individual Defendants pursuant to the agreements attached hereto as Exhibits A through E, which permitted the Individual Defendants to use the Trade Secrets solely for Fenner's business operations.  The Individual Defendants only had access to the Trade Secrets by virtue of their employment with Fenner.

150.    The Individual Defendants knew they were subject to a duty to maintain the secrecy of and limit the use of the Trade Secrets.

151.    Despite such knowledge, the Individual Defendants, upon information and belief, have willfully and maliciously misappropriated Fenner's Trade Secrets by sharing them with ICR.

152.    ICR, which was founded by former Fenner managers, knew or should have known that the Trade Secrets were derived from the Individual Defendants and that the Individual Defendants owed a duty to Fenner to maintain the secrecy of the Trade Secrets or to limit their use.

153.    Despite such knowledge, ICR, upon information and belief, has willfully and maliciously misappropriated Fenner's Trade Secrets by using the Trade Secrets to directly compete against Fenner.

154.    As a result of Defendants' misappropriation, Fenner has suffered and will suffer damages in an amount to be determined.

155.    In taking these actions, Defendants have acted intentionally, maliciously, and/or in reckless disregard of Fenner's rights such that Fenner is entitled to exemplary damages as well as an award for its attorneys' fees, expenses, and costs.

## COUNT V

### (Breach Of Contract Against Coleman)

156.    Fenner realleges and incorporates paragraphs 1 through 155 above as if set forth herein.

157.    Fenner has fully performed its obligations under the Coleman Agreement.

158.    The restrictions set forth in the Coleman Agreement are reasonable and necessary to protect the legitimate business interests of Fenner.

159.    Coleman has materially breached the Coleman Agreement and his obligations to Fenner.

160.    As a direct and proximate result of Coleman's breaches of the Coleman Agreement, Fenner has suffered, and will continue to suffer, damages as well as irreparable harm in the form of a loss of customers, loss of customer goodwill, and loss of future business opportunities.

## COUNT VI

### (Breach Of Contract Against Hall)

161.    Fenner realleges and incorporates paragraphs 1 through 160 above as if set forth herein.

162.    Fenner has fully performed its obligations under the Hall Agreement.

163.    The restrictions set forth in the Hall Agreement are reasonable and necessary to protect the legitimate business interests of Fenner.

164.    Hall has materially breached the Hall Agreement and his obligations to Fenner.

165.   As a direct and proximate result of Hall's breaches of the Hall Agreement, Fenner has suffered, and will continue to suffer, damages as well as irreparable harm in the form of a loss of customers, loss of customer goodwill, and loss of future business opportunities.

## COUNT VII

### (Breach Of Contract Against King)

166.   Fenner realleges and incorporates paragraphs 1 through 165 above as if set forth herein.

167.   Fenner has fully performed its obligations under the King Agreement.

168.   The restrictions set forth in the King Agreement are reasonable and necessary to protect the legitimate business interests of Fenner.

169.   King has materially breached the King Agreement and his obligations to Fenner.

170.   As a direct and proximate result of King's breaches of the King Agreement, Fenner has suffered, and will continue to suffer, damages as well as irreparable harm in the form of a loss of customers, loss of customer goodwill, and loss of future business opportunities.

## COUNT VIII

### (Breach Of Contract Against Zebley)

171.   Fenner realleges and incorporates paragraphs 1 through 170 above as if set forth herein.

172.   Fenner has fully performed its obligations under the Zebley Agreement.

173.   The restrictions set forth in the Zebley Agreement are reasonable and necessary to protect the legitimate business interests of Fenner.

174.   Zebley has materially breached the Zebley Agreement and his obligations to Fenner.

175.    As a direct and proximate result of Zebley's breaches of the Zebley Agreement, Fenner has suffered, and will continue to suffer, damages as well as irreparable harm in the form of a loss of customers, loss of customer goodwill, and loss of future business opportunities.

## COUNT IX

### (Breach Of Contract Against Caringola)

176.    Fenner realleges and incorporates paragraphs 1 through 175 above as if set forth herein.

177.    Fenner has fully performed its obligations under the Caringola Agreement.

178.    The restrictions set forth in the Caringola Agreement are reasonable and necessary to protect the legitimate business interests of Fenner.

179.    Caringola has materially breached the Caringola Agreement and his obligations to Fenner.

180.    As a direct and proximate result of Caringola's breaches of the Caringola Agreement, Fenner has suffered, and will continue to suffer, damages as well as irreparable harm in the form of a loss of customers, loss of customer goodwill, and loss of future business opportunities.

**WHEREFORE**, Fenner Dunlop Americas, LLC respectfully requests judgment in its favor and the following relief against Defendants International Conveyor & Rubber, LLC, Ryan J. Caringola, Michael J. Coleman, Jordan L. Hall, Richard A. King, Jr., and Jeffrey A. Zebley:

A.    Judgment in Fenner's favor and an award to Fenner of full compensatory and consequential damages against all Defendants, in an amount to be determined at trial;

B.    An award of exemplary and/or punitive damages in favor of Fenner in an amount to be determined at trial;

C.      An award to Fenner of its reasonable attorneys' fees and expenses and costs incurred in bringing and having to pursue this action;

D.      An Order compelling the Individual Defendants to comply with the restrictive covenants in their agreements;

E.      An Order prohibiting Defendants from utilizing Fenner's trade secret information and requiring Defendants to return all trade secrets they misappropriated from Fenner;

F.      Such other and further relief as the Court deems just and equitable.


Dated:  March 8, 2017                          Respectfully submitted,

SHUMAKER, LOOP & KENDRICK, LLP     LUND METCALFE, LLC

Gregory H. Wagoner (OH 0076132)          By: s/*Donald M. Lund*_____
Katherine S. Decker (OH 0085600)          Donald M. Lund (PA 66800)
1000 Jackson Street                       Michael A. Metcalfe (PA 209573)
Toledo, OH 43604-5573                     1900 Main Street, Suite 253
                                          Canonsburg, PA 15317
Admission *pro hac vice* pending          dlund@lundmetcalfe.com
                                          mmetcalfe@lundmetcalfe.com
                                          Telephone: (724) 230-4901
                                          *Attorneys for Plaintiff,*
                                          *Fenner Dunlop Americas, LLC*


## JURY DEMAND

Plaintiff demands a trial by jury on all matters so triable.

                                          Respectfully submitted,

                                          By: s/*Donald M. Lund*_____
                                          Donald M. Lund (PA 66800)

                                          Attorney for Fenner Dunlop Americas, LLC

Date:  March 8, 2017

34